No. 11,793.

SUCCESSION OF H. C. McCAN.

A testamentary disposition in favor of minors conditioned they attain majority, the shares of those who die before to accrue to the survivors, carries all the mischiefs of the prohibited substitution, though not one in the technical sense. By such will against the text and spirit of our law, ownership, with its attributes of possession, enjoyment and power to sell not vested at the death of the testatrix is suspended indefinitely, *i. e.* until the youngest child becomes of age; for the same period the property is stamped with inalienability and put out of commerce, and besides the testatrix undertakes to designate the heirs of those of the legatees who may die after her, while under the law the testamentary power is exhausted when the testatrix designates the heir living at her death. Civil Code, Arts. 1519, 1520; 5 An. 461; 7 An. 416, 420; 8 An. 248.

The power of last will derived from the law must be exerted, so as to conform to ownership, and its modifications prescribed by the Code, and can not introduce into our system novel titles. Under our law the heir, testamentary or legal, must be vested with full title at the death of the testatrix, the extent and limitation of her power in this respect being marked by the permission of the Code, that for a single life ownership may be divided by the will giving to one the usufruct, and the title to another; hence, the will instituting the heir under a condition conferring on him no present right, at the same time excluding the legal heir from all possession and control, and substituting for both the testamentary and legal heir, a species of trusteeship, to hold and render the property to the heirs, whoever they may be, who survive when the condition is fulfilled prescribed by the testatrix, is void as against our law and the policy on which it rests, because seeking to introduce a tenure our law does not recognize or enforce. Civil Code, Arts. 488, 491 *et seq.;* 533 *et seq.;* 544 *et seq.;* 940, 941, 942, 943, 944, 945, 946, 947, 1607, 1613, 985, 1522; Code Napoleon, Arts. 718, 724, 1040; 7 An. 416; 8 An. 248 *et seq.;* 5 Merlin, 368, 369.

| 48 | 145 |
| 48 | 1219 |
| 48 | 1222 |
| 49 | 611 |
| 49 | 972 |
| 49 | 1177 |
| 49 | 1182 |
| 48 | 145 |
| 52 | 50 |
| 52 | 51 |
| 52 | 85 |
| 48 | 145 |
| 110 | 76 |
| 48 | 145 |
| 119 | 280 |

10

Under our Code the seizin of the executor subordinated to that of the heir must end whenever the heir requires it, and can not be extended by the will. Civil Code, Art. 1671; Clague's Case, 13 La. 6; Provan vs. Percy, 15 La. 169; 3 An. 705.

The testamentary disposition that executors shall hold the property of the testatrix, make necessary investments, provide for the education and support of the minor legatees, and administer until they attain majority, the property then to be delivered to them by the executors, is substantially a trust for minors, none the less, because sought to be conferred on executors clothed by the law with no such functions, and such disposition falls within the prohibition by our Code of all *fidei commissa.* Civil Code, Arts. 1520, 1668, 1666, 1668, 1670, 1671, 1672, 1674, 1675; 13 La. 6; 3 An. 433; 5 An. 460; 7 An. 420; 8 An. 248; 12 An. 767; 15 An. 154; 30 An. 1020; 36 An. 755.

APPEAL from the Civil District Court for the Parish of Orleans. Theard, J.

*Farrar, Jonas & Kruttschnitt,* and *Fenner, Henderson & Fenner* for Executor, Appellee:

I.

There are some questions of law, the final settlement of which is vastly more important to society than how they are settled; and among these are rules of property long recognized and acted upon, and under which rights have vested. *Misera est servitus ubi jus est vagum aut incertum.* Broome's Legal Maxims, p. *151; Endlich on Interpretation of Statutes, Sec. 363, p. 508; Aicard vs. Daly, 7 An. 612; Farmer's Heirs vs. Fletcher, 11 An. 142; Wells on *Res Adjudicata* and *Stare Decisis,* Secs. 597, 598, pp. 547, 548; Rockhill vs. Nelson, 24 Ind. 424; Harron vs. Myers, 29 Ind. 470; Reid vs. Ownby, 44 Mo. 206; Kearney vs. Buttles, 1 Ohio St. 366; Lion vs. Burtiss, 20 Johns. 487; Kingsbury vs. Whitaker, 32 An. 1055.

The interpretation of a statute, when made by the highest court of the State, which enacted it, becomes a part of the statute itself —so much so, then, when a contract has been made on the faith of such interpretation, a subsequent change of decision, which would impair the obligation of such contract, is held by the Supreme Court of the United States to be the equivalent of a new law, impairing such obligation, and equally amenable to the constitutional prohibition. That high tribunal has uniformly held that if a contract when made, is valid by the laws of the State, as then construed by its courts, subsequent decisions

altering the construction of those laws will not be followed by the Federal Courts. 1 Peters, 351, 476; 11 Howard 297; 20 Wall. 137; 91 U. S. 452; 94 U. S. 315; 101 U. S. 665; 107 U. S. 20; 125 U. S. 555; 131 U. S..258, 319, 331.

### II.

Is a provision of law leaving a legacy to a grandchild of the testator, on condition that the property composing the legacy shall remain under the administration of the testator's executor until the legatee's majority, a valid disposition, excluding the gestion of the natural tutor?

We answer in the affirmative:

(a) Upon the jurisprudence of Louisiana, and the principle of *stare decisis*. Succession of Macias, 31 An. 127; Succession of Turnell, 32 An. 1218; Succession of Strauss, 38 An. 55; Succession of Stephens, 45 An. 962; Calvert vs. Boullemet, 46 An. 1134.

(b) Upon the law of this State, even if the question be considered as *res nova* independently of the above authorities.

(c) Under the French jurisprudence, which rests upon principles the same, in so far. as this question is concerned, as our own. Limousin vs. Hersant, *Journal du Palais*, Vol. I, for 1838, p. 388; Ed. Frazier Herman, Code Annote, Commentary on Art. 387, C. N., p. 489, No. 13.

### III.

If the court should decide that the testator had the right to vest the administration in the executor, until the majority of the legatees, then all further questions raised in this case become merely theoretical, hypothetical ones, or at most such questions as the court need not, and should not at present decide.

### IV.

Is a disposition, whereby the testator bequeaths his whole property to his minor grandchildren, on condition of their reaching the age of majority; but that, in default thereof, the property shall pass to others, amenable to the objection, that it is a substitution prohibited by the Civil Code, or is the legacy one subject to an illegal condition, and, if so, what will be the effect of such illegality?

We answer both alternative questions in the negative:

*(a)* On authority of Succession of Strauss, 38 An. 55, and Sevier vs. Douglass, 44 An. 608.

*(b)* On the French authorities cited.

*(c)* On the clear provisions of Arts. 985 and 2030 of the Code, which contemplate just such legacies as the one under discussion.

## V.

The claim that the heirs are owners of the fruits *pendente conditione*, considered and refuted, in so far as this particular case is concerned. C. C. 499, 1607, 1608, 1631.

Article 499 declares that the fruits belong to the owner, whence, logically, if the thing belongs to the owner conditionally, the fruits should belong to him conditionally.

Articles 1607 and 1608, however, detract from this general principle, and provide that the enjoyment of the universal legatee shall commence only from date of judicial demand, or from the day on which delivery has been agreed upon, and under these articles, the heirs having the seizin, would generally be entitled to fruits, for the reason that the legatee could not claim them until after the accomplishment of the condition.

Article 1631, however, provides that the will shall be respected when the testator has expressly declared that the proceeds of the thing shall accrue to the benefit of the legatee, from the date of the decease, without his having brought suit for the same. This latter article foresees exactly the case at bar, in which the testator has disposed of the fruits from the date of his decease.

The above principles are established not only by reason but authority. Laurent, Vol. 13, Sec. 541; Volume 14, Secs. 66 to 85, inclusive, and especially Sec. 78.

## VI.

Even if it be admitted that every provision of this will is valid as to the disposable portion, does it follow that it is also valid as to the *legitime*?

We answer in the affirmative upon the authorities of the Macias, Strauss and Turnell cases and on reason.

*"Omnis innovatio plus novitate perturbat quam utilitate prodest."*

"The rules which govern the transmission of property are the creatures of positive law, and when once recognized and established, their justice or injustice in the abstract is of less importance to the community than that the rules themselves should be constant and invariable." Lord Chancellor Westbury; Ralston vs. Hamilton, 4 Macq Scotch App. 405.

"The last will of those who depart this life is the last expression of their love, friendship or gratitude, and, where it violates no law, that will, by for the most sacred of all sacred things, should be as respected as the grave of the dead." Succession Michon, 30 An. 217.

"A conditional legacy, when the conditions are neither impossible nor reprobated by law, must and can be accepted by or for the legatee, but in accordance with the terms of the will." Succession of Macias, 31 An. 137.

Our Code recognizes three distinct kinds of succession, and three distinct kinds of heirs, the latter being testamentary or instituted heirs, legal heirs and irregular heirs. R. C. C. 875, 876, 879.

A succession is either a testamentary or a legal succession; it can not be both. An heir is either an instituted heir or a legal heir; he can not be both. The law, and not the wish of the heir, determines the nature of the succession and of the heirship. Legal heirship, or heirship *ab intestato*, and instituted heirship, or heirship *ab testato*, are radically contradictory and antithetical concepts.

Renunciation by instituted heirs and by legal heirs is governed by the same rules, which are laid down in Secs. 1 and 2 of Chap. 6, title 1 of book III of the Code. The only acceptance or renunciation which the Code recognizes or deals with is the acceptance or renunciation of successions.

Renunciation by an instituted heir, like renunciation by a legal heir, is a renunciation of the succession, and in both cases it has the same effect, viz.: to terminate the interest of the heir in the succession. An heir can not renounce the succession and take the succession.

Renunciation of this testamentary succession, and of this instituted inheritance by these children, will terminate their interest in the succession, so far as the disposable is concerned, which, in that event, would go to legal heirs who had not renounced.

The foregoing are not only scientific deductions from the law, but they furnish the only principle consistent with the execution of the lawful will of the testatrix; the sole object and dominant purpose of which was to prevent them from taking as legal heirs, and to require them either to take as instituted heirs subject to conditions imposed or not to take at all.

They support the alternative distinctly presented to the instituted heirs in the Strauss case, viz.: "The law would compel them to elect whether they would, as forced heirs, take their *legitime* without conditions, or accept the whole estate under the conditions imposed by the testator." They can never escape this alternative, if the institution is maintained as valid; and it follows that their clear interest requires acceptance.

Even if the above clear principles did not settle the question, even if they could renounce the institution, and take, each his virile share, as legal heirs, still the law would accept the institution for them. They are not instituted in common; they are third persons with reference to each other; their interests may be contradictory; each has a right to have his own particular interest consulted; if one only of them should reach majority he would take the whole estate, and it would certainly have been greatly to his interest that the succession should have been accepted. The interest of each depends on future uncertain events, and possibly even on present facts, such as the health and strength of the children respectively, of which the court has no knowledge. And in the impossibility of determining what is the interest of each particular one, the court would accept for them and thus execute the will.

The law expressly permits the institution of heirs under suspensive conditions, and if this contravenes, to any extent, other general prohibitions of the law, to that extent such prohibitions must submit to contravention. No prohibition can be extended to prevent that which the law expressly permits.

The argument that, even if the will does not create any successive order of ownership, yet the fact that the law reposes the ownership in some legal heirs, until the happening of the conditions, involves a prohibited substitution—is utterly unsound. The testatrix had no concern with, and no control over, what the law would do with the legal title. The very definition of the

prohibited substitution in Art. 1520 of the Code shows that the
successive order prohibited is that created by the disposition it-
self. The French authorities in maintaining such conditional
institutions as that here presented, admit that the legal title
rests in the legal heirs until the happening of the conditions, but
neither they, nor any one else before, ever supposed that this
fact could introduce into the disposition of the will the elements
of a prohibited substitution.

When analyzed, it will be found that the provisions of this will are
lawful, simple, reasonable; that they injure no right of any per-
son in the world; and that they contain nothing hostile to any
consideration of public policy.

---

*Saunders & Miller, E. Howard McCaleb,* and *Thomas J. Semmes,*
for the Guardian of the Minors, Appellee:

The first disposition contained in the will, by which the testatrix
gives all she may die possessed of to her five grandchildren,
*conditioned* on their attaining the age of majority, and if either
of them dies in the meantime, the part so given to go to the
survivors, conditioned on their attaining the age of majority, is
illegal. (a) The legatees are kept out of possession for thirteen
years, and in the meantime the title to the property is vested in
no one. No partition can be sued for by the co-proprietors,
who held some of it in common with the testatrix, for the exec-
utors can not represent the heirs in such suit. 30 An. 177.
(b) This condition violates the maxim "*le mort saisit le vif,*"
for during the minority of the conditional legatees the title to
the property is vested in no one. R. C. C. 940, 941, 942, 944;
2 La. 299; 4 An. 571; 10 Rob. 194. (c) Conditional heirs can
not accept nor renounce before the condition has happened.
R. C. C. 985; Merlin Rep. *verbo Condition,* Vol. 5, p. 367; 44
An. 611. (d) The disposition in favor of the survivors is a pro-
hibited substitution. It resembles the pupillary substitution of
the Roman law, which was abolished in France in 1792. C. N.
896 prohibits one person from making a testament for another.
Dalloz Jurisprudence du Royaume, T. 12, p. 155; Case of
Georges Milano, decided at Turin in 1806; Merlin Rep., *verbo
Substitution Directe,* paragraph II, tome 32, p. 71 *et seq.* The

survivors inherit not from their deceased brother or sister, but by virtue of their grandmother's will. (e) It changes the rule of descent established by law and excludes the mother, a forced heir (R. C. C. 1494), from inheriting from her children (R. C. C. 904), and deprives the minor legatees, after attaining the testamentary age of sixteen years, from disposing of their property by last will. R. C. C. 1477. (f) The legacy is void for uncertainty in the legatees. 14 An. 537. (g) Conditional substitutions are included in the prohibition contained in our Code. 1 R. 115; 4 La. 502. (h) It is incontestibly a prohibited substitution. 4 N. S. 45; 13 An. 574; 5 An. 552; 14 An. 578; 29 An. 120, 235; 34 An. 557. (i) The distinguishing feature between a *conditional legacy* and a *prohibited substitution* is that *in the former there is but one degree*, while *in the latter there are two* or more *degrees*. In conditional legacies the legatees hold directly from the testator; in substitutions the substituted legatee holds immediately from the instituted heir. A conditional legacy can not contain more than one condition, but in a substitution there may be two or more conditions, as on this case. Duranton, T. IX., No. 313; (David), Journal du Palais (1849), T. 52, p. 379; Journal du Palais, T. 22, (1820), p. 777.

(a) The clause appointing a trustee to administer the property during the minority of the conditional legatees is a *fidei commissum*. This administration is in no way connected with the functions of the testamentary executor. Such a disposition is a *fiducie*, or trust, and though valid in France is expressly forbidden by our Code. 3 An. 432; 12 An. 767; 30 An. 1017; Merlin Rep., *Fiduciaire*, T. 12, p. 184; Laurent, T. 14, Nos. 402, 403. (b) The court could not appoint a dative trustee should Hall die or resign. 30 An. 1017. (c) This clause creates a *quasi*-tutorship *quoad* the legacy. 45 An. 962. The grandmother can not appoint a tutor by will. 10 An. 169. (d) Hall is the *gravatus* or interposed person—the tutor under the will. 15 An. 700, 154. (e) Such a trust estate is void under our laws as a *fidei commissum*. 13 La. 2; 36 An. 754; 7 An. 395.

The French courts and commentators are not authoritative expositions of the law of Louisiana regarding *fidei commissa* and substitutions. For they are permitted, to a limited extent, by the

Napoleon Code in Arts. 1048 to 1074 inclusive, which are not to be found in the Louisiana Code. Art. 1055 C. N. authorizes the testator to nominate a tutor charged with the execution of the substitution. The Napoleon Code, the decisions of the French courts and the writings of French commentators inadvertently led this court into error in the Succession of Macias, 31 An. 127, and the Succession of Strauss, 38 An. 55, when the principles contained in the French Code had been previously examined and repudiated as vicious and unsound in 1 Rob. 115 and 3 An. 432. The jurisprudence of this State on the subject of *fidei commissa* substitutions was approved by the United States Supreme Court in 15 How. 367.

The clause prohibiting the mother from administering the property given to her children during their minority is contrary to public order and good morals, a violation of both human and divine law. R. C. C. 1519. It is a flagrant invasion of parental authority. Laurent, T. 11, Nos. 448 and 449.

The death of David C. McCan, the substituted legatee, before the testatrix, nullifies the entire disposition and prevents the condition under which he was to take from ever being accomplished. R. C. C. 1697; 44 An. 605; R. C. 1698. *This fact* alone *differentiates this case from the Succession of Strauss*, 38 An. 55; Dupin's Pothier, T. 7. p, 635; *Idem*, 644.

The testatrix was without authority to dispose of or to impose conditions and burdens upon the *legitime* of her grandchildren, her forced heirs to the extent of one-third of her estate. R. C. C. 1493 and 1710; 32 An. 1218; 34 An. 388.

(b) Even in France, where substitutions are permitted, the *legitime* can not be burdened with a substitution. C. N. 1049; Laurent, T. 14, Nos. 533 *et seq.;* Duranton, T. 9, p. 524; Domat's Civil Law, Vol. 2, No. 3838.

A testamentary substitution is a disposition whereby property is given to A, and at his death to B, thus superseding the legal order of inheritance from A, and substituting a special order of inheritance prescribed by the testator.

It is immaterial whether the disposition provides that B shall take whenever A dies, or whether it provides that he shall take if A dies before a fixed time, or before the happening of an uncertain future event or condition. The conditional, or contingent substitution, is as objectionable and void as that which is absolute.

In order to determine whether a particular testamentary disposition does or does not involve a substitution it is essential, first, to determine to whom the property passes from the testator, so that it can then be seen whether the disposition controls the order of inheritance from that person.

At the moment of every man's death in this State, the title to his property instantly vests in some definite person or persons. The person or persons so succeeding to the title of the deceased are either the particular persons designated by law as the legal heirs, or the persons named in the will as heirs or legatees.

The law does not permit the title of the deceased to be suspended. Any condition in a will requiring the title to be suspended, so that it shall not vest in any particular person until a future time, is contrary to law and void.

The title to Mrs. McCan's property could have vested at her death in but one of two sets of persons, and in one or the other of these it must have vested. These sets of persons were:

a. Her grandchildren.

b. Her trustees.

If the title vested in the grandchildren, then, inasmuch as Mrs. McCan attempted to prescribe who should be the heirs of these children if they should die under twenty-one, there was a patent substitution.

If the title is vested in the trustees, there was a patent *fidei commissum*.

The decision in the Succession of Strauss, 38 An. 56, is palpably in conflict with the express provisions of the Civil Code, and with all our antecedent jurisprudence. If that decision is followed, the enactments of Code will be abrogated by judicial legislation.

The French cases referred to in the Strauss decision were decided expressly on the theory that under the French Code a testator has the power to suspend the vesting of the title to his estate.

In the Strauss case the court did not even attempt to determine in whom the title. was, and apparently sanction the idea that a testator can suspend the ,vesting of the title to his estate. Unless, therefore, this court is prepared to sanction the propositions that the question of substitution *vel non* can be determined without knowing where the title is, and that the title to a succession can be suspended at the will of the testator, the Strauss decision must be abandoned.

In any event, the dispositions of Mrs. McCan's will must be taken as referring only to that portion of her estate which she had the right to dispose of. She nowhere alludes to the *legitime*, much less does she declare that it is a condition of her gift of the disposable portion that the *legitime* shall be administered in the same manner and by the same persons she appointed to administer her gift. The only condition expressed in the will is that the property given shall be administered in a prescribed manner. There is no condition that the *legitime* shall be administered in the same manner.

To stipulate, as the condition of the gift of the disposable portion that the minors should consent to submit the *legitime* to an administration different from that provided by law, would be to impose a condition or charge on the *legitime*. This is forbidden by the Code (Art. 1710), and the stipulation would therefore be void. (Art. 1519.) And this court can not imply such a condition where it is not expressly and clearly stated.

---

Argued and submitted May 10, 1895.
Opinion handed down December 2, 1895.
Rehearing refused February 10, 1896.

---

The opinion of the court was delivered by

MILLER, J.   This appeal is by Mary Tobin Stempel, guardian of her minor children, from the judgment of the lower court against her in the suit to annul the will of Hester McCan, the grandmother of the children, the issue of the marriage of Mary Tobin Stempel with Charles P. McCan, the son of the testatrix.

The will assailed is as follows:

"I give all I may die possessed of to my grandchildren, Kate Elizabeth McCan, Fanny Tobin McCan, David Chambers McCan, Hester Margaret McCan and Charles Patterson McCan, the children of my deceased son, Charles P. McCan and Mary Tobin, the giving to them to be conditioned on their attaining the age of majority.

"In case either of them dies be ore attaining the age of majority, then the part or portion given as above conditioned to accrue to the survivors, likewise conditioned on such survivors attaining the age

of majority, the true intent being to make my said grandchildren my universal legatees upon condition that they reach majority.

"I desire that during the minority of my said grandchildren, the money, property and values above given them conditionally be administered by my friend, Harry H. Hall, of this city, and my husband, David O. McUan, of this city, without security.

"The foregoing person or persons who may act are to invest said amount in good securities or properties and to apply the revenues, so much thereof as may be necessary,.to the education and support of my said grandchildren. They are to administer the same for the benefit of said grandchildren and to pay over the same to them on the happening of the condition on which my gift to them is based.

"I expressly exact as a condition that none of the property or values given by me to my grandchildren be ever in any way administered during their minority by their mother or by her husband.

"In the event of my said grandchildren all dying before the happening of the condition by me above mentioned, that is they or any of them reaching the age of majority, then I institute as my universal legatee my husband, David O. McUan.

"I institute and appoint my husband, David O. McUan, and Harry H. Hall my testamentary executors with seizin and without security."

The husband of the testatrix died before her.

The grounds on which the will is assailed are that its conditions are contrary to law and public policy, and that it contains substitutions and *fidei commissa*, prohibited by law. The argument against the will is directed to the institution of the five grandchildren as legatees, conditioned they attain majority, in the event of the death of any before, their shares to accrue to the survivors, still conditioned they attain majority; the property during the minority of the grandchildren to be administered by Harry H. Hall and the husband of the testatrix, and to be delivered to the legatees on the happening of the condition on which the legacy depends. The contention if successful, would give the property to the legatees, they being the legal as well as testamentary heirs of the testatrix. The prayer of the petition is that the will be annulled, that the children be recognized as the legal heirs, and as such be put in possession through their guardian. The argument for the will upholds its conditions; denies it contains any substitutions and insists that the dispositions constitute the con-

ditional legacy permitted by our law, accompanied by a provision equally valid, it is claimed, for the administration of the property by the executor until the majority of the legatees.

Our law prohibits substitutions and *fidei commissa* distinct, but bearing resemblance, and both, to exclude any doubt, fall within the prohibition. The substitution in acts of last will is to bequeath property to one or more, to be succeeded in the enjoyment of the property by others designated by the testator. The *fidei commissum* is to bequeath property to be held for and delivered to another. In the substitution the successive legatees each have an interest in the property or an advantage to be derived from it. The *fidei commissum* is a mandate or trust with no interest conferred on the legatee charged only to deliver. "Every substitution is a *fidei commissum*, but every *fidei commissum* is not a substitution." 1 Dalloz, 655; 1 Troplong, pars. 86, 130, 101, 102; 5 Toullier; Ducloslange vs. Ross, 3 An. 432. The language of the Code is that substitutions and *fidei commissa* are and remain prohibited; every disposition by which the donee, heir or legatee is charged to preserve for, or return a thing to a third person, is null with regard to the donee, heir or legatee. The Code excepts the disposition by which the testator names another to take when the legatee first named does not take. This is called the vulgar substitution and not prohibited. There is the permitted disposition, but at the same time, limitation on the power of last will when the Code declares that the testator may give the usufruct to one, and the title to another. The Code also declares that illegal impossible conditions, and those contrary to morals, shall be reputed not written. Civil Code, Arts. 1520, 1521, 1522, 1519; Ducloslange vs. Ross, 3 An. 432; Beaulieu vs. Ternoir, 5 An. 480.

The Napoleon Code, with some exceptions, forbade substitutions. Arts. 896, 897. Besides, the jurisprudence under that Code withdrew from the prohibition, dispositions by which the legatee, without interest, was merely the medium by which the property was to be delivered to another, or, in other words, when the legatee was a mere mandatary. 1 Dalloz, p. 655, No. 12. But in these dispositions the distinction prevailed of such as were to be executed in the life of the "grevé" or person charged with delivery, and those not to be executed till his death. These last fell within the prohibition. 5 Toullier, pars. 12, 21, 48. With these exceptions and others, unnecessary to be discussed, the Napoleon Code, like ours, prohibited the

disposition by which property was bequeathed to one or more, to be preserved for and delivered to others. Nor is it at all material under the Napoleon Code or our own, that there should be the express charge to preserve and render, stated in the Code. Where the property is bequeathed to one, to be succeeded by another, or others, there was the substance of all that the express charge to render could convey. 5 Toullier, par. 48. The mischiefs of the prohibited substitutions are obvious. There is no ownership, that is full ownership, vested at the death of the testator, with the inevitable result that inalienability is impressed on the property, putting it out of commerce; there is a successive order of heirship dictated by the testator to operate after his death when man's control should end; this order is to supersede the law of inheritance established by public policy for all men, and if permitted, substitutions would tend to accumulate property in the hands of those the caprice of the testator might prompt him to favor, according to seniority of birth, survival, of sex or of consanguinity, or other test of heirship the testator might choose to adopt. Our law is marked by the simplicity of the titles by which property is held, and is utterly opposed to the suspended and uncertain ownership incident to substitutions or the system of entails of the common law; it is our policy that ownership should vest at the death of the testator, so that there should exist no restraint on alienability of property; and the theory of our Code is that property at the death of the owner must be transmitted according to the modes prescribed for holding property, and not by novel and complicated tenures devised by testator. Whenever these features have been found in testamentary dispositions, our court has stricken them with nullity, and has been guided by substance and not the mere form of the testator's words. Civil Code, Arts. 1520, 1522, 1519, 488, 490, 491, 492 et seq., 533, 641 et seq., 886 et seq.; Cloutier vs. Lecomte, 3 Martin, 485; Farrar vs. McCutcheon, 4 N. S. 45; Arnaud vs. Tarbe, 4 La .504; Henderson Case, 5 An. 470; Franklin Case, 7 An. 416.

The argument to sustain this will is, that the property is not left to one or more to be transmitted to others, or in other words there is no successive order of heirs the type of the prohibited substitution; and the legacy is sought to be maintained as conditional in its character recognized by our Code. Code, Arts. 1698, 2030; 5 Toullier, par. 45 et seq; Journal du Palais for 1885, p. 520, and other

authorities are cited from the French jurisprudence. The conjoint legacy gives to the survivors the shares of the legatees who die before the testatrix, when the property is bequeathed as an entirety without designation of parts. But this right of survivorship ends with the testator's death. The property then vests absolutely in the surviving legatees, and as owners in common they hold, subject to the right of any of them to compel a division, a right which even the testator can not impede, except for a limited period. Civil Code, Arts. 1299, 1300, 1301. The French authorities tend, we think, to recognize as continuing beyond the testator's death the right of survivorship that exists in the conjoint legacy. They maintain these dispositions when it is possible to hold that each of the legatees named conjointly, under a will conditioned that the survivor shall take the shares of deceased legatees, is to be deemed a usufructuary. 5 Toullier, par. 45, pp. 59, 61. On the same line we appreciate the authorities cited by defendants from Laurent, Fuzier-Herman and others. Defendants' first brief, p. 19 *et seq.* If we could read a line of this will as creating any usufruct in favor of any of these legatees, the application of these authorities would be more obvious. The will excludes any such usufruct. A tenure of property by several minors, with a right of the survivor to take the shares of those who die, would be deemed a novelty in Louisiana. All can understand the conjoint legacy and its effect when the testator dies, in giving an absolute title. But that he can create any such conditional or qualified ownership to subsist after his death, is not of easy appreciation. The French authorities admit a close resemblance to the prohibited substitution in the cases they cite in this connection. We are far from satisfied that any such disposition can be supported under our jurisprudence. A tenure by which, after the death of the testator, his property is to be held under the condition it is to go to the ultimate survivor, if any, of a number of legatees, if they attain majority, finds no place in that part of our law which defines ownership and its modifications. It was tersely put in one of the numerous decisions of our courts on this subject, that the testator must exert the power the law gives him in conformity with the titles prescribed by our law, and can not introduce new tenures. Succession of Franklin, 7 An. 420. This will is supposed to be rescued from all difficulties, because none of the legatees are to take until the condition occurs, and because the substitution in its technical sense,

can not be applied to the condition that those who survive shall take the portion of those that die. Yet under this will no ownership, in the sense of full ownership, is vested at the death of the testator. So it is in the substitution, for title by the substitution is transmitted from heir to heir as prescribed by the testator until it finally reaches the last and complete owner. Here, the title is in abeyance; the property not susceptible of alienation, and put out of commerce, until the remote period when the youngest child becomes of age. The testator not only names his heirs, but he, not the law, prescribe those who are to succeed years after to the heirs living, when the testator passed to the grave. If there is any evil intended to be excluded by our Code in prohibiting substitutions that this will does not present, we fail to perceive it. We pass to another part of this will, in respect to which it can derive no aid from the decision of the Court of Cassation and authorities cited in that connection, dealing with wills not like this, linked with other features of prominent significance.

If this will is to be supported on the theory that it institutes heirs under a condition, then until the happening of the condition the heirs can have no possession, exercise no control, and are clothed with no vestige of ownership except the hope of succeeding in the future. Civil Code, Art. 985; Code Napoleon, Arts. 1040, 1168; Sirey Code Annotes; Notes on Art. 1040, 5th Merlin, p. 369. But it is indispensable that until the conditional heir is called, there should be possession and ownership. It is the principle of our Code that the title in the plenitude of ownership passes with the last gasp of the testator to the living heir. The testator may divide ownership by giving to one the usufruct, and to another the property. "For a single life" he may make that division. Succession of Franklin, 7 An. 416. But ownership, whether divided or not, must vest at the death. If divided, still it vests, and the elements are reunited at the end of a single life. In testamentary successions the universal legatee is seized of right, if there are no forced heirs. If the heir is instituted under a condition, the legal heir is seized, holds and makes the fruits his own. "Il résulte des règles que nous venons d'expliquer que le chose léguée sous condition reside jus qu'a l'évènement de la condition dans l'héretier seul, aussi l'objet d'un leges conditional est compris dans les choses de l'hérédité." In legal successions the heir at the moment of death suc-

ceeds. Nor does the seizin of the executor in the least interfere with that of the heir. Civil Code, Arts. 940, 941, 942, 944, 1613; Code Napoleon, Arts. 719, 718; McDonald vs. Lobdell, 2 La. 299; 5th Merlin, pp. 714, 715. In the Macias case, to be discussed in another connection, and which is relied on to sustain the will, the decision emphasized that feature which the court conceived to be essential and present in the will. It was a legacy to a minor with the charge that the executor was to retain possession of the property until the majority of the minor. In the view of the court "the title vested in the legatee" from the date of the testator's death; had she died it would have passed to the heirs of the legatee. Succession of Macias, 31 An. 128. The Strauss case, 38 An. 55, relies on the Macias, its predecessor. Is it to be said that title in the sense of present ownership vests in the legatees, who, in this case, can have no possession or control for years, and may never attain the condition on which their title depends? It will not be pretended that any ownership is conferred on those to whom the testator intrusts the possession and administration of the property to endure for the period before the conditional heir can exert the slightest control or obtain possession. The will gives no present title to the conditional heir, and at the same time excludes the heir from all possession. It conveys no title in the sense of "Le mort saisit le vif," demanded as we think by the text of the Code and our jurisprudence. The will fails under this test, and that would be its fate under the French Code and jurisprudence. Succession of Franklin, 7 An. 416.

Our attention is next directed to that part of this will which directs that until the majority of the youngest child, the estate is to remain in the hands of his friends named also as his executors, and to be delivered by them to the heirs or the survivors, when the period arrives for delivery. It is the Macias decision in 1879, and the Strauss decision in 1886, that it is claimed gave complete sanction to such a disposition. Our law prohibits all fidei commissa. Our jurisprudence has excepted trusts susceptible of immediate execution. The trusts of executors in respect to their duties as such, have, of course, never been deemed within the prohibition. Mathurin vs. Livaudais, 5 Martin, N. S., 303; Caldwell vs. Hennen, 5 Robinson, 20. This provision in the will is manifestly prompted by the desire of the testator to make

11

provision for the education and supp rt of the minors from the revenues of the property. He was not willing to trust the agencies provided by law for the accomplishment of these purposes. The laws provide tutors under guarantees deemed adequate to secure their faithful administration. The persons, the testator names, are to hold, manage the property, make investments and provide for the support and education of the minors until the period fixed by the will, and then the property is to be delivered to the surviving legatees. If none survive, a contingency not contemplated by the will, the property would have to be rendered to the legal heirs, whoever they might be at that period. The trusts of the common law States for minors, married women and others incapable of administering their property, are prompted by precisely such motives as guided the testator and are forcibly suggested by the words he has employed. In the other States the beneficiary or *cestui qui trust*, for whom the trust is established, has no control over the property; the revenues are used for his support; and in the case of minors also for their education; the investments of money and management of the property is confided exclusively to those holding the legal title called trustees. In this case the term trustee is not used, nor is the legal or any title conveyed, but for all substantial purposes it is not easy to perceive in what respect the disposition under consideration differs from the common law trusts. Our courts have time and time again, held such trusts to be within the sweeping prohibitions of all *fidei commissa*. When it is considered that the duties of an executor are defined and restricted by our law, and are not those of a trustee for minors, it must seem difficult under our law to create such a trust in substance, and because conferred on an executor escape the prohibition of any form of *fidei commissum* so plainly announced by our Code, and rigidly enforced by a century of jurisprudence. Still less, can any such trust be imposed on an executor to endure in this case for the maximum period of thirteen years, or indeed for any term the testator chooses to fix, when under our law the seizin of the property can not extend one moment of time, beyond the demand of the heir for possession, and the tender of the amount required to pay the special legacies. Civil Code, Art. 1671; Percy vs. Provan's Executor, 15 La. 69; Succession of Fisk, 3 An. 705. The functions delegated by the law to executors, and the obvious limit they carry, that is to affix seals, make the inventory of the property of the testator,

sell it, if requisite to pay debts or legacies, institute or defend suits, file his account, and pay the balance in his hands to the heir, or, in his absence, to the State treasury, utterly precludes any power in the testator to convert an executor into a trustee for minors, in the face of the prohibition of our law against *fidei commissa* determined by our entire jurisprudence to embrace and forbid trusts by whatever mode, created, or proposed to be executed.   The plain limitation on the seizin of the executor, it would seem, is complete denial of any right in the testator of extending that seizin for years, or indefinitely or for a fraction of time, least of all, for purposes not at all within the scope of the executor's functions.   It is claimed here in argument, that notwithstanding the marked limitation of the functions of the executor, expressed so forcibly by the very text of the Code, yet that the decisions cited in this connection, maintain that the testator can put his property in the hands of an executor to remain for years until the minors attain majority, then to be rendered to them, in the meantime their wants to be looked after by the executor, and provided for from the revenues.   All this, it is urged, can be done, in the full view of the prohibition in the Code of all trusts, whether for minors or others, and whether created by will, donation or contract.   The law provides the instrumentalities for the care of minors and their property, but these agencies were not in contemplation in that part of our Code dealing with the capacities of executors.   The Macias decision in 1879, dealing with a charge in the will, that the executor shall not deliver the property until the majority of the minor legatee, maintains that condition under the authority the court attributed to a decision in 1841, of the Supreme Court.   Clague's Case, 13 La. 6.   The most obvious comment is that this decision invoked to support this kind of trust, sought to be carried out by an executor, is the terse condemnation of any such function.   The disposition, observed that eminent jurist Justice Martin, as the organ of the court, by which the estate is to be put in the hands of the executor, there to remain until the majority of the minor legatees, then to be delivered to them, can not be distinguished from the charge to preserve for and return the estate to them at their majority.   The court thus assimilating the disposition so as to bring it within technical words of the substitution, deemed the illegality of the will too clear to admit of discussion, thus: "Such a disposition is indeed a *fidei commissum* for-

bidden by our law.   Clague Case, 13 La. 6.   That ground was enough. But the court found another in the law then limiting the executor's term to one year.   Code of 1825, Arts. 1666, 1667.   The Macias decision simply mistakes this additional reason, for that ground mainly in the contemplation of Judge Martin, and ample to support his decision, i. e., the forbidden trust Clague's will sought to create.   If, indeed, at that time the executor's term had been longer it would have furnished a stronger reason, if any was needed, for the conclusion against a will tying up property for years in the hands of executors for ultimate delivery to legatees, if they chanced to attain majority.   But it is plain the term of the executor was but the secondary non-essential reason, not the factor of the decision. When this court is asked to sustain this will on the Macias or that of the Strauss decision, the authority on which those decisions rest is brought under examination.   That examination destroys the supposed authority and relieves the Martin court from any sanction, express or implied, of a disposition condemned by the decision itself in the strongest terms language can supply.   This very Clague decision has been the guide of all later decisions down to the Macias case, and is referred to as authoritative in the leading cases in which the whole line of *fidei commissa* and of trusts were examined.   Heirs of Henderson vs. Rost, 5 An. 460; Succession of Franklin, 7 An. 420; McDonogh cases (State of Louisiana, etc., vs. The Executors of McDonogh), 8 An. 171, again referred to in the case of Partee vs. Hill, 12 An. 767, in the case of Succession of Foucher, 30 An. 1020, and in the case of Succession of Stevens, 36 An. 755.   Trusts occur most frequently in testamentary dispositions, and executors are most frequently selected for their execution.   We are asked in effect to hold that a trust is withdrawn from the prohibition, if to be fulfilled by the very class presumably, in contemplation when the prohibition was put in the Code.   Until the Macias decision, no one dreamed that the least change in respect to *fidei commissa* was produced by the scant legislation extending the term of executors.   That extension was to afford time for the performance of their duties, not to obliterate the law of trustees and convert executors into trustees. By no known course of interpretation can any such purpose be attributed to the brief Act of 1837, in reference to the term of executors.   Session Acts, p. 96.   If, in Judge Martin's opinion, it was unlawful to tie up property in the hands of executors, it remained and

is now prohibited, irrespective of the period assigned for the executor's duties. In our view nothing was further from his contemplation; nothing more apart and distinct from that he did decide. The Strauss decision is the offspring of the Macias, and clings to it in great part for support. In the Strauss decision the court observed that the practical effect of the will was to give the minors legatees the usufruct until they reached majority, and the title when majority was attained. That argument is not advanced here. We can not grasp that process of reasoning by which it can be concluded that this will creates, or that the Strauss will brought into existence any usufruct in any sense known to our laws. If we could, this will would be brought within the shelter of Art. 1522 of the Code, which, denoting the limit of testamentary power, permits him " to divide usufruct from ownership for a single life." Succession of Franklin, 7 An. 416; Civil Code, Arts. 533 *et seq.* Usufruct is actual possession with the right to enjoy profits, fruits and revenues, with title in the usufructuary commensurate with all purposes of the usufruct. To maintain any usufruct in anybody, under the Strauss will or this, is to suppose usufruct without possession; title where vestage there is none in the legatees for years to come, and it may be never; and would be to import by a construction resting, as we think, on no basis the other elements of usufruct defined by our law. In the case of Calvert, Tutrix, vs. Boullemet, 46 An. 1133, this Strauss decision came up incidentally to the question then raised, whether money bequeathed to a minor, not to be paid by the executor until majority of the legatee, could on the resignation of the executor be demanded by the tutor. The court took occasion to observe the Strauss decision was not called in question, and disposed of the case on the ground that the executor could not, by resigning, release himself from the obligation, and thus furnish a ground for the tutor's demand. In the Stephens Succession, 45 An. 962, the court announced its adherence to the decision in the Stevens Case, 36 An. 755; held that the legacies to major heirs could not be kept by the testator's will in the hands of executors, and as to legacies to minors, the court guardedly observed, that question, when it came up, would be considered. The Strauss decision was referred to as deflecting from the line of preceding decisions. In our opinion, the Macias and its prototype, the Strauss decision, stand alone in our jurisprudence. The last leans on the first

and the first, in our view, is refuted by the decision of Judge Martin, on which it claims to rest. We have considered with attention the line of French authorities arrayed in the brief on this question of the *fidei commissa* beginning with Laurent and Demolombe. But of what assistance are these authorities in dealing with the question of *fidei commissa* permitted under the Napoleon Code, but utterly prohibited by our Code. Code Napoleon, 896. As put by Judge Eustis in the case of Duclos-lange vs. Ross, 3 An. 433, in a case supposed to prevent a substitution within the scope of those permitted by the French Code, tolerant of such dispositions, when involving the mere *fidei commissum*: "The difference between that and our Code on the subject of *fidei commissa* does not enable us to avail of French authorities in determining the question" then before the court. If, therefore, the authorities cited sustain the disposition of the character in question here, it would not advance the solution of the question now under consideration. But in the light of a *fidei commissum* or trust there is no discussion by the French authors, for the obvious reason that the Napoleon Code has no prohibition of such trusts. The authorities relied on by the defendant in this connection, examine the testamentary power to exclude the control of the tutor of the property of the minor. They affirm such control can be exerted by the testator with reference to the property he bequeaths to the minor, but that the control of the person, education and care of the minor child is protected from any interference. Demolombe indicates this discussion and its object in his conclusion that the clause of the testament, which takes from the father the administration of property bequeathed, does not prejudice the paternal power." 6 Demolombe, 344. Laurent and others on the same line arrayed in defendant's brief. It is on this line, too, that the Strauss decision sought assistance. In our view they afford no aid, and relate to a question not at issue here.

Our own jurisprudence, partially already considered, is, we think, inflexibly opposed to this will. The defendant cites the case of Succession of Cochrane, 29 An. 235, and the case of Succession of Charmbury, 34 An. 26. They involve bequests to minors, and for investments of their legacies, not to be paid till the minors attain majority. The cases differed materially from that before the court, and there was no discussion of the question here presented. The Clague case, directly applicable here, appropriately

stands prominent on this question.  In the Henderson Case, 5 An.
460, the court, dealing with the trust sought to be created, and with
the powers of executors, observed, if it would be illegal for the
testator to leave his property to any person, or set of persons, with
the charge to preserve and render it to another as is conceded, it
was equally unlawful to tie it up in the hands of executors forever.
It was not the length of time it was to be tied up, but it was the
trust attempted to be created that controlled the decision.  In the
Franklin case and McDonogh cases, in both of which trusts were
attempted to be established, the courts again enforced the article of
our Code as utterly excluding such tenures.  There was no place for
them, the court held, in our sytem, and no machinery for their
execution.  Succession of Franklin, 420; State of Louisiana vs. Execu-
tors of McDonogh, 8 An. 228.  In the Partee Case, 12 An. 767, the
testator bequeathed a sum of money to be held by trustees and paid
over to the legatee at the period fixed by the will.  The court citing
the Clague case, held the trusteeship void; that the trusts of the
common law embraced in the codal prohibition of *fidei commissa*
could not be created in Louisiana and enforced in our courts.
Again, in the Succession of Perin, 15 An. 154, where the trust was
to be enforced by executors, the court held that trust estates of
the common law, with their refined complications, were pro-
hibited under the exclusion of all *fidei commissa*.  In the Suc-
cession of Foucher, 30 An: 1020, the legacy was to minors
by the testatrix in France, and she directed the appointment
of administrators in Louisiana to hold and administer the
legacies until their majority.  Again, with a reference to the
Clague case, the court held the wishes of the testatrix could not
be carried into effect, repeating that our law prohibited *fidei commissa*.
The court observed it inclined to the opinion the clause in the will
fell under that prohibition, and found another reason that as a con-
dition it was illegal and to be reputed not written.  In some of these
cases the trusts were in reference to immovables, in others with
respect to personal property, sums of money.  Some were confided
for their execution to trustees *eo nomine*, others to executors.  In
all, the courts treated them as *fidei commissa*.  In the Succession of
Stevens, 36 An. 755, the testator bequeathed his estate to his execu-
tors in trust for the benefit of his sisters and the children of one of
them.  The testator's object was to secure for the children an educa-

tion, provide for the wants of all the legatees, and one thousand dollars to each; the children were to be paid when they became of age.   This disposition, so far as respects the mode of administration and payment of the legacies, is not distinguishable in substance from that now presented.   The agents selected were the executors; their functions were to be the same as those proposed for the executor in this will, and the only difference is the formula bequeathing to them in trust, conveying no title under our law.   The decision in the Strauss case, can not, in our view, be reconciled with that in Stevens' rendered but two years previous.   The court in the Stevens case pronounced the striking feature of the will to be the trust estate the will proposed.   This, said the court, flowed so clearly from the reading of the will that no argument was needed; an attempt to demonstrate it would be to support a self-evident proposition, and the court contents itself with stating the line of decisions on the question.   Yet the Strauss decision follows two years afterward, maintaining as lawful a disposition, the difference between which, and that utterly set aside in the Stevens case is, to our minds, unappreciable.   This court attaches deserved sanctity to *stare decisis*, the defendant invokes.   In our view that rule would not be observed if we allowed to stand as the jurisprudence of Louisiana, decisions, iso-lated, and as we think, contrary to our Code and the unbroken line of decisions up to the moment of the Macias case, quickly followed by the Strauss decision, still further breaking in on that, hitherto deemed settled.   It has not been without the maturest deliberation we have reached our conclusion.   We think the appreciation of Judge Martin, announced more than fifty years ago was then the law, has been of constant recognition since, and is to-day the law of Louisiana. We feel bound to adhere to it.

The decree appropriate to this case has received careful con-sideration at the hands of the court.   The provision keeping the es-tate from the legal heirs must yield to the law.   They are entitled to possession.   A decree to that effect we think, will meet the exigency of the case.   In all probability there will be no occasion for any further adjudication and we reserve all other questions that may arise not covered by the decree.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be avoided and reversed it is further ordered, ad-judged and decreed that the minors, Fanny Tobin McCan, David

Chambers McCan, Kate Elizabeth McCan and Charles Patterson Mc-
Can be recognized as the legal heirs of Hester Calloway McCan, and
as such, through their guardian, Mary Tobin Stemple, be and they are
put in possession of the property of said deceased, Hester Calloway
McCan; that the provision of the will of said deceased giving the pos-
session, control and administration of said property to Harry H. Hall
and David C. McCan be and is hereby decreed to be void and of no
effect; that all questions not covered by this decree be preserved,
and that appellees pay costs.

NICHOLLS, C. J., and BREAUX, J., concur in the decree.

## CONCURRING OPINION.

WATKINS, J.    Taken by themselves, the provisions of the will
which dispose of the property of the testatrix, possibly do not
amount to a substitution prohibited by law, and same may be con-
sidered as alternate or conditional bequests or vulgar substitutions
permitted by law.    Yet the Code not only prohibits the creation of
substitutions, but *fidei commissa* as well.

The will of Mrs. McCan provides " that during the minority of the
grandchildren" the money and property " given them conditionally
(shall) be administered by my *friend*, Harry H. Hall, and my hus-
band," etc., and not by Harry H. Hall as executor; for it will be
observed that, by a separate and distinct clause of the will, Mr. Hall
is appointed executor.    The two appointments are totally different
things.    Harry H. Hall, in his individual capacity, is given the ad-
ministration of the *property* and authorized to invest its revenues;
and in a subsequent portion of the will he is designated as co-execu-
tor of the *estate* of the testator.

With regard to the administration of Mr. Hall, its direction is that
he shall invest the money and values that shall come into his hands
" in good securities and properties, and apply the revenues or so
much thereof as may be necessary to the education and support of
the grandchildren," and further that he is " to administor the same
for the benefit of said grandchildren," etc.

In order to particularly emphasize this bequest, the testatrix de-
clares that she " expressly exacts as a condition that none of the
property or values given by me to my grandchildren (shall) be ever,
in any way, administered during their minority by their mother or
her husband."    And, as if to still further fortify this theory of the

testatrix, the bequest to the grandchildren is predicated upon the legatees "attaining the age of majority."

From all these provisions of the will, it distinctly appears that the condition which holds the *title* of the legatee in suspense is so bound up with the administration of the testatrix' friend, the tenure of which is to continue until the condition is fulfilled at the majority of the fourth, or youngest, grandchild, that the conditional bequest takes on the character of a *fidei*-commissary substitution, such an administration being, of itself, a *fidei-commissum* in the sense of our Code and jurisprudence; a naked trust created by the testator's will, suspending the property from commerce for a series of years, as well as the revenues.

This idea is greatly strengthened, when it is considered that the beneficiaries under the will are, at the same time, legal heirs of the deceased, and forced heirs to the extent of one-fourth of her estate, and entitled to make claim therefor, independently; and that they do, in fact, attack it on the ground that they are legal and forced heirs.

The will further provides that, in the event of neither of the grandchildren arriving at the age of twenty-one years, the husband of the testatrix shall be universal legatee; but, as he died previously to the testatrix, there is *in esse* no adverse claimant to the grandchildren; therefore, the executor is without right to assert the administration of Mr. Hall in his individual capacity, as a means of defence to the claims of the heirs. In no event has Mr. Hall the right to interpose his right of administration, which was *confessedly established for their benefit*, as a means of defeating their claim.

Counsel for the executor make this important admission in their brief (the one filed May 18, 1895, p. 16), viz.: "No one else than the children will now get any interest in this estate, whatever the decision of this court may be. No question can arise as to the effect of any *substitutions* or illegal conditions, until the date when one of the children dies, whether testate or intestate, married or single, with or without children, and before majority. Prior to that contingency, the second of the questions now agitated at bar is purely a moot, or hypothetical one. The real, vital question for the present is, who is to administer the property?"

But while it is true that no one else than the grandchildren will get any interest in the estate, yet it is equally true that they attack

the will as null in its entirety, and at the same time assert title to the entire estate, property and revenues; and it can not be denied that, if their attack prove unsuccessful, they will be still entitled to its benefits under the conditions imposed; or, being only partially successful, in securing the avoidance of the part relating to the administration of Mr. Hall, they would be entitled to immediate possession, either as legal or testamentary heirs *pendente conditione.*

The will in the *Strauss* case (Succession of Jacob Strauss, 38 An. 55), designated several asylums as the testator's universal legatees on the failure of his grandchildren to arrive at majority, and they were *in esse* at the date of the decision. In addition, the opinion does not draw any distinction between a substitution and a *fidei commissum,* as paragraph one will show.

That part of the argument is rested exclusively upon the theory " that the practical effect of the feature (of the will relating to the administration) is to vest the *usufruct* or right of enjoyment of the testator's estate in his grandchildren, subject to the executor's administration, until they shall have reached the age of majority."

In the first place that statement is not correct in point of fact, because the terms employed in the will are " my friend Judge E. D. White," and not " executor;" and the terms of the will are further to the effect, that his friend Judge White should "invest said amount in good securities, and apply the proceeds to the education and support of said grandchildren;" while in the McCan will, this phrase has superadded the following, viz. : " or so much thereof as may be necessary "—thus clearly destroying the applicability of the *Strauss* case to the McCan will.

The distinguishing feature of the Macias case, 31 An. 127, is that the *sole universal legatee* named was the granddaughter of the testatrix, and *without any condition being imposed in respect to the property itself,* the terms of the will being, that " the estate shall be administered by the *executor* without the intervention of anybody else, until the majority of the granddaughter and universal legatee."

The court held that not to be an illegal or impossible condition, and that the heir, or legatee can not divide his acceptance; and, further, that the heir was compelled to accept the legacy with the conditions imposed, or not at all. And, as in that case, *the sole effort of the tutor was to rid the minor's inheritance of that condition,* and to place himself in possession, the court held that this could not be one.

It must be observed, as quite a significant fact, that the plaintiff *did not attack the Macias will as null* at all. Taken in this light, the decision in that case is altogether different from the *Strauss* case, and is not a precedent for the *Strauss* decision.

Though it is quite evident that the reasoning of the court in reference to the *term* of the executor (p. 128) is erroneous, and that the decision in Clague's Widow vs. Clague's Executors, 13 La. 6, is applicable to the facts stated in the Macias and Strauss cases. And *it* emphatically declares that "a disposition by which the property of the estate was to remain in the hands of the executors *until the majority of the testator's children* and legatees was a *fidei commissum*," etc.

But the Macias case was peculiarly circumstanced as to its facts, the statement of the court being, viz.: "The condition imposed by a clause in the will—and it does not appear to be an extravagant one —is that said legacy be not placed under the control of one who was the debtor of the testatrix, who disputed the validity of his claim against him," etc.

And, in view of this clause in the will, the court made this remark, in conclusion, viz.:

"We, however, consider it admissible to state that the clause of Mrs. Macias' will, which excludes from any participation in her affairs the father of her universal legatee, can not prevent him from *supervising as tutor*, unless his pretended incapacity be judicially ascertained and declared, that branch of the executor's administration which relates to the *interest of the minor in the succession of her grandfather*," etc. (My italics.)

It is apparent from the foregoing that the father of the legatee was personally inimical to the testatrix, and that that expression of the will evidently exerted a decided influence upon the opinion of the court sustaining it; and that the decision would have been different had that clause of the will been omitted. For, in fact, the court *restricted* the executor's right of administration to the *succession* proper, and fully recognized the right of the tutor to *supervise* "that branch of the executor's administration which related to the interest of the minor *in the succession* of his grandfather," "unless his *pretended incapacity* be judicially ascertained and declared."

Suppose, however, the incapacity of the tutor had been "judicially ascertained and declared," what would have been the result?

Why, of course, another tutor could have been appointed in his place, who would have had the legal right, under that decision, " to supervise that branch of the executor's administration which related to the interest of the minors in the succession of her grandfather."

That this was the purport and object of the decision of the Macias case, fully appears when the decision of the Succession of Foucher, 30 An. 1020, by the same court, in the year previous, is considered.

That decision is predicated upon a will similar in terms to those of the *Macias* will, and the tutor of the minors who were legatees, without any condition as to the property bequeathed, demanded of the executors immediate possession of their interest in the estate, "because, by the laws of this State, the tutor is alone and exclusively entitled to administer the property belonging to his wards;" and " that respondents, as the natural tutrices of their minor children, can not be deprived of the administration of their property by the appointment of any special administrators, who are officers unknown to our laws, because the said disposition creates a trust or *fidei commissum*, which is prohibited by the laws of Louisiana."

After premising that " in France, where this will was written, the law permits the testator to appoint an administrator to minor beneficiaries of the will," and making mention of the fact that our Code does not so provide, the court say, viz.: "It is obvious that the testatrix' * * * intention was that the special administrator should retain the custody of the portions of the minors and *administer them during their minority. This was a trust*, and it does not differ in any respect from the disposition in Clague's will, except that the persons charged with the trust in Clague's will were the testamentary executors," etc.    (My italics.)

And the conclusion of the court was "that the clause of the will of the *Marquis de Circé* in question falls within the prohibition of Art. 1520 of the Revised Civil Code," etc.

But in the opinion in the *Macias* case, there is no mention of the Succession of Foucher.

The *Macias* decision was further isolated by the present court, through Judge Fenner as its organ, in Succession of Turnell, 32 An. 1221, in which it is referred to thus, viz.:

" The decisions in the Succession of Macias, 31 An. 127, and McCalop vs. Stewart, 11 An. 106, only applied Art. 1301 of the Code to a case properly falling under its provisions, as just interpreted by
    ," etc.

*Vide,* also Ventress vs. Brown, 34 An. 456.

This appears more evident when the Succession of Steven, 36 An. 758, is considered, and in which quite a similar bequest was involved. Of it the court, through Judge Poché, say: "The striking feature of the will is the manifest intention of the testator to establish a trust estate, to be held by the executors, and to be preserved by them for other persons, a disposition which has uniformly been treated in our jurisprudence as a *fidei commissum* and always held as falling under the prohibition contained in Art. R. C. C. (1507) of the Civil Code."

And in support of that proposition the opinion cites the following decisions, viz.: Arnaud vs. Tarbe, 4 La. 506; Clague vs. Clague, 13 La. 6; Rachal vs. Rachal, 1 Rob. 115; Ducloslange vs. Ross, 3 An. 432; Succession of Foucher, 30 An. 1017; Beaulieu vs. Ternoir, 5 An. 480.

But there is no mention made of the *Macias* case.

These cases are in line with other adjudicated cases which are not mentioned. For instance, in Hoggatt vs. Morancy, 10 An. 169, the court said of a similar testamentary bequest, viz.:

"The tutorship of the minor child belongs of right to the surviving mother or father. C. C. 268. The disposition of the will which gave the guardianship of *Anthony Hoggatt's* children, at his death, to the executors of the testator, violated this article. In that respect this case resembles that of *Clague* in 13 Louisiana Reports, above cited."

The will propounded and interpreted in Percy, Tutor, vs. Provan's Executor, 15 La. 70, provided that the whole of the testator's estate be sold and the proceeds thereof invested, "and that the funds so invested remain under the control of his executors until the age of majority of his son," etc; and of that provision the court say, viz.:

"It appears to us perfectly clear that the defendant, Richardson, can not, as executor, keep in his possession and administer the estate of the minor; this is not one of the powers and privileges given by law to testamentary executors, and any clause in a testament which would extend their powers, in their mere capacity as executors, to keeping the funds of a succession in their hands after they become *functi officio*, ought, in our opinion, to be considered not written."

In the Succession of Cochrane, 29 An. 234, the court said, viz.:

"If the money had been given to some one charged to keep it

until the majority of the child, and then to give it to her, this might have been a prohibited *fidei commissum*, but it would not have been a substitution." ·

This was the condition of our jurisprudence when the Strauss decision was rendered (38 An. 55), and it is only necessary to cite the opening sentences of paragraph *one* (p. 58) to show its variance in a most essential feature from all decisions which treat of *fidei commissa*. They are as follows, viz.: "The charge of a *fidei commissum* refers to that disposition in the will which subjects the property of the testator to the administration of the testamentary executor until the minor legatees shall have reached the age of majority.

. "Under the provisions of our Code, a *fidei commissum* is understood to be a disposition by which the donee, the heir, or legatee is charged to preserve for or return a thing to a third person. R. C. C. 1520."

The foregoing decisions make it plain that the definition given of a *fidei commissum* is altogether incorrect. The opinion confounded a *substitution* with a *fidei commissum*. The language of the Code clearly shows this. It is as follows, viz.:

" Substitutions and *fidei commissa* are and remain prohibited.

" Every disposition by which the donee, the heir or legatee is charged to preserve for or return a thing to a third person is null, even with regard to the donee, the instituted heir or legatee.

" *In consequence of this article*, the trebellianic portion of the civil law, that is to say, the portion of the property of the testator, which the instituted heir had a right to retain, when he was charged with a *fidei commissa* or *fiduciary bequest*, is no longer a part of our law." R. C. C. (1507) (My italics.)

It is obvious that the second paragraph of that article relates to substitutions, that is to say bequests which provide for two absolute takers of the *property* of the testator, both of whose titles are derivable from the testator; but the third] paragraph relates to *fidei commissa*, that is to say "*fiduciary bequests*," with which some one is entrusted by the terms of the will until the happening of some uncertain contingency or event. Indeed the term " fiduciary bequest " implies a *trust committed* and *not a title conveyed*. If the terms *substitution* and *fidei commissum* were not different things, why should both have been by the Code conjunctively denounced?

In Ducloslange vs. Ross, 3 An. 432, the court say that " the pro-

hibition of the Code is so general that no particular class of *fidei commissa* is expected from it."

Again:

"There is no necessity for explaining the difference between the substitution and the *fidei commissum*. It is sufficient to state that they are not identical; for though every substitution is a *fidei commissum*, every *fidei commissum* is not a substitution."

The same definition is given in Beaulieu vs. Ternoir, 5 An. 480, and in Duplessis vs. Kennedy, 6 La. 247.

And in Duplessis vs. Kennedy, *supra*, an important distinction is made between the effect of the two, the substitution annulling the testament, while the *fidei commissum* avoids the trust, or fiduciary bequest only.

And in treating this question, the court said in Michel vs. Beale, 10 An. 359, viz.:

" To have that effect, that of annulling the will, the act of donation must impose on the donee an obligation of possessing for, or returning to another, the thing which is the object of the donation. In other words, to import the nullity of the whole act, there must not only be a *fidei commissum*, but a substitution."

And what appears to me to be more evidently erroneous is what immediately follows the foregoing quotation from the *Strauss* case in the same paragraph, viz.:

" The practical effect of that feature of the will," the one which relates to the power of administration, " is to vest the *usufruct*, or right of enjoyment of the testator's estate in his grandchildren, subject to the executor's administration, until they shall have reached the age of majority, and bequeathed to them the *naked ownership of the same* at the time they shall reach that age " (p. 58).

Under the provisions of the Code " the heir who is instituted under a condition can not accept nor renounce the succession before the condition has happened," etc. R. C. C. 985 (979). And it further provides that " a succession is acquired by the lawful heir, who is called by law to the inheritance, immediately after the death of the deceased person to whom he succeeds." R. C. C. 940 (934).

And that article provides that " this rule refers as well to *testamentary heirs* as to instituted heirs and universal legatees." *Id.* (My italics.) If this were not so, where would the title be during the pendency of the condition?

The French law on this subject is very much the same as our own, though less general, for it provides:

" When, at the decease of the testator, there are heirs to whom one portion of his property is reserved by the law, such heirs are *seized absolutely by his death, of all the property of the succession;* and the general legatee is bound to demand from them a transfer of the property comprehended in the will." C. N. 1004.

From these articles it necessarily results, that the succession of Mrs. McCan, devolved upon her grandchildren immediately after her death, subject to the happening of the condition imposed by the will, by which their title as legal heirs may be defeated. The consequence is, that th ↄ *limited* employment by Mr. Hall, as *administrator under the will,* of the revenues of the estate of the deceased, during the minority of the legatees, is *in no sense an usufruct,* because the estate of the deceased, from which the revenues are to be derived, *is the property of the legal heirs of the deceased, and not of another;* and the Code says that usufruct " is the right of enjoying a thing, the *property of which is vested in another.*" (My italics.) R. C. C. 525.

Surely neither the *Macias* decision, nor any other decision, is authority for either of the foregoing propositions.

The theory of the Strauss case is clearly erroneous, sustaining, as it does, the administration of Judge White on the score of an usufruct.

On the contrary, the enjoyment of the fruits and revenues of the grandmother's estate is a *faculty of ownership;* and so it was in the Strauss case and in the Macias case (R. C. C. 498).

The attempt in the Strauss case was to separate the right of use and enjoyment from that of ownership by incorrectly styling it the usufruct of the legatee, which is an anomaly in our law.

Certainly, the right of the grandchildren to the fruits depends upon the same conditions as their right to the property. All their rights under the will depend upon the same conditions. To style the use of the fruits *to the extent they are necessary for their education and support, an usufruct,* in order to maintain Mr. Hall's administration of the *whole* for a period of years, is to misinterpret the plain letter of the law and sustain a " *fiduciary bequest,*" which is a *fidei commissum.*

It is a well recognized principle that an executor's seizin is for

12

specified, purposes, viz.: The payment of debts and the discharge of
special legacies; and when there are neither debts nor special lega-
cies—as in this case—his duties are entirely formal, and the testa-
mentary heirs and universal legatees are entitled under the law to
discharge him, and to be placed in possession. Succession of Fisk,
3 An. 705; Succession of Baumgarden, 36 An. 49; Succession of
Charmbury, 34 An. 26.

" The heirs can, at any time, take the seizin from the testamentary
executor, on offering him a sufficient sum to pay the movable lega-
cies and on complying with the requirements of Art. 1013." R. C. C.
1671.

And this is the law, notwithstanding it is further declared that
" executors shall continue in office until the estate shall be finally
wound up" (R. C. C. 1673), the effect of the last article being to
deprive an executor of any specific term, and to permit him to re-
main in office so long as the administration of the estate renders it
necessary. Soye vs. Price *et al.*, 30 An. 96; Lynne vs. City of New
Orleans, and Manning vs. the same 26 An. 48; Succession of Dunford
and Marie Charlotte Reni, his wife, 25 An. 36; Succession of Robert
Y. Charmbury, 34 An. 21; R. S. 3673; C. P. 1013.

Can it be seriously contended that the testatrix had the legal right
to constitute Mr. Hall an administrator, and confer upon him the
power to manage and control her estates for a long series of years
after her death, until the youngest of her grandchildren shall become
of full age; and, in the event that neither of them should arrive at
the full age of twenty-one years, to *absolutely divest the title of any of
their children who might be intermediately born*, of all interest in her
estate, and convey it to strangers?

To my mind this is *reductio ad absurdum.*

This proposition is combated and completely overthrown by this
court in the Succession of Stephens, 45 An. 962, in which the court,
through MR. JUSTICE BREAUX, said:

" A disposition by will in which the property donated is to remain
in the hands of the executor until the legatee who has arrived at the
age of majority shall be twenty-four years of age can not be contra-
distinguished from one that seeks to prohibit the sale, or other exer-
cises of the right of ownership, and is therefore an impossible con-
dition, illegal, and to be reputed not written."

After referring to Succession of Steven, 36 An. 754, the opinion proceeds thus: "We are aware that there may be some difficulty in reconciling the conclusion in the case cited with the ruling in *Macias* and *Strauss* cases (31 An. 127, and 38 An. 59), but as the case cited has not been overruled in terms, and is supported by other decisions previously rendered, we feel authorized to rely upon it in this case. *   *   .*

"The two cases, *Macias* and *Strauss*, deflect somewhat from the line of preceding decisions. We will· not discuss the departure. *   *   * Whatever may be the appreciation of those decisions when the necessity will arise for their consideration, we are confident that the principles announced will not be extended as applying to legatees not under legal disability. The last decisions countenance the creating of a *quasi* tutorship *quoad* the legacy. They will have to undergo the test when a question arises involving the interests of minors."

It is quite obvious that this court seriously questioned the correctness of the *Macias* and *Strauss* decisions, and expressly declined to follow them, as did the court in the 36th of Annuals.

It seems clear to my mind that the ground assigned for the *Macias* and *Strauss* decisions disposes of the question, for the reason that they recognize the right of administration in the executor, and not in the tutor of the minors. And, in law, an executor represents legatees of all ages. Indeed the court in those cases declined to recognize the rights of the minors, and gave the administrator precedence over the tutor.

Applying the doctrine of the two Stephens cases, that a legatee of full age can not be deprived of possession by an administrator or executor, there is no reason for saying that a legatee who is a minor can be deemed to be in a different situation.

But that question the court decided differently in Soye vs. Price, 30 An. 93, and the correctness of that opinion has been since steadily maintained. For in that case the court said:

"Notwithstanding the numerous authorities cited by counsel of defendants, from our earlier reports, we think it is now well settled that *minors* (who are beneficiary heirs of necessity) may come lawfully into the possession of the estate of their deceased parent without there having been any administration thereof"—citing Martin vs. Dupre, 1 An. 239; Balph, Admr., vs. Hoggatt, 2 An. 462; Succession

of Story, 3 An. 502; Monget, Tutor, vs. Penny, 7 An. 134; Hoover vs. Sellers, 5 An. 180; Hair & Labusan vs. McDade, 10 An. 584; State vs. The Heirs of W. R. Leckie and His Sureties, 14 An. 641.

"These cases clearly recognize the right of the natural tutor of minor heirs of the deceased, in the absence of opposition, to take possession of the estate in his capacity as tutor, and to administer it as other property of his ward for their benefit. The possession of the tutor is the possession of the minor, and all his acts are in the name and on behalf of his wards."

All the cases I have collated herein declare that under the terms of the Code a tutor has the *absolute* right to administer the property of his wards, and that it is out of the power of a testator to deprive him of it.

And in each of the following cases this court has decided that the provision of a will which directs an executor or other person to administer the property of the testator's estate *during the minority* of the legatees, is a *fidei commissum*, and consequently null, viz.:

Clague vs. Clague, 3 La. 6; Percy vs. Provan, 15 La. 70; Hoggatt vs. Morancy, 10 An. 169; Succession of Foucher, 30 An. 1020; Succession of Will Steven, 36 An. 750.

Reference is made in defendants' briefs to the case of Calvert vs. Boulemet, 46 An. 1134, as sustaining their position. But the will in that case only involved the *date* of *payment* of an abso ute *special* legacy, and is somewhat like the *Macias* case. For the opinion in its opening statement says: "The will originally gave to the minors without condition or qualification, the amount of the legacy  *  *  * The codicil further directed the legacies to be administered by the testatrix for the benefit of the minors, until their majority, or emancipation. *The executrix was the wife as well as the universal legatee.*" She qualified, administered the estate, filed and had her final account homologated, herself placed in possession and finally discharged. Subsequently, the tutrix of the minor children demanded of the discharged executrix the payment of the special legacies which had been bequeathed to them, and the defence was that she was entitled to retain and keep possession, notwithstanding her discharge, being universal legatee.

And in sustaining the defendants' theory, the court said, in explanation, that it "reached this conclusion the more readily, in view of the great solicitude exhibited by the testator on this point—*i. e.*,

that no *payment* of their legacies should be made until the majority
or emancipation of the minors, and until then should be held and ad-
ministered by his executrix," she being at the same time surviving
widow of the testator, and his *universal legatee in possession of his
entire estate.*

The minors being *special* legatees, and that, too, upon the happen-
ing of an eventual condition, the discharged executrix was *merely
their debtor of a debt not yet due.*

But, in this case, we are dealing with no universal legatee; the
one designated in the will having died prior to the death of the tes-
tatrix.

The difficulty with the *McCan*, as with the *Strauss* will chiefly is,
that there is no *absolute taker* for the property, at all; and by the
several conditions which the former imposes, the property is to be
administered by a stranger, for a long term of years, and the rights
of legal or forced heirs may be thereby ultimately divested.

Indeed the argument of couns 1 for the executors is that the
*legal* heirs are without right to either the property or its revenues,
*pendente conditione.* If that be true, both must remain under the
administrator's control, with the faculty of preserving same for and
returning them to the conditional heirs, or the State ultimately.

In the meanwhile, the right of sale, and all other "exercises of
ownership" would be suspended indefinitely, and thus, in effect, a
prohibited substitution accomplished.

And to this effect are all the decisions of this court.

In Clague's Widow vs. Clague's Executors, 13 La. 5, and which has
been followed since with unanimity in all subsequent cases, the court
said:

"A disposition by which the property of the estate is *to remain in
the hands of the executors until the majority of the testator's children,*
one of whom is under ten years of age, can not be distinguished
from one that would author ze the executors to preserve for or re-
turn the estate to them, at the period of the majority of the children
and heirs.

"Such a disposition is indeed a *fidei commissum* or trust, which the
law forbids" (La. Code, 1507).

But it must be observed that such is not the course of decision by
the French court, because the law of France is different; and in
Rachal, Tutor, vs. Rachal, 1 Rob. 115, this court very clearly out-

lines the distinction which exists between our law and that of France as follows, viz.:

"The clause under consideration would be valid under the Code Napoleon, the provisions of which are less rigorous than ours on the subject of substitution." It contains an exception authorizing substitutions in favor of the grandchildren of a testator or the children of his brothers and sisters. Code Napoleon, Arts 1048–1049.

"It is well known that most of the provisions of the new, as well as of the old Code, were borrowed from the Code Napoleon, and the presumption is that the framers of the Code of this State would have expressly retained the exception, if such had been their intention. Instead of doing so they have made the prohibition a general one, and we can not make a distinction which is not found in the law."

And in Ducoslange vs. Ross, 3 An. 432, the court further defined that distinction thus:

"It is quite possible that the donation under consideration might not be considered a substitution, according to the doctrine of authors who have discussed the subject with reference to the provisions of the Code of Napoleon. But the difference between the two Codes on the point does not enable us to avail ourselves of the benefit of their lights in determining on the matters before us.

"By the Napoleon Code, Art. 896, substitutions are, in general terms, prohibited, with several exceptions, however, which are expressly reserved; but *fidei commissa* are not prohibited; on the contrary, so far from being abolished, they are maintained, and their recognition is considered as resulting from Art. 967 of the Code."

And for the sake of precision I will reproduce the articles cited:

"Every disposition by which the donee, the heir appointed or the legatee, shall be charged to preserve and render to a third person, shall be null even with regard to the donee, the heir appointed and the legatee." C. N. 896.

"Every person shall be at liberty to dispose by will, either under the title of appointment of an heir, or under the title of legacy, or *under any other denomination proper to manifest his will.* C. N. 967. (My italics.)

But it further provides an express exception in favor "of dispositions permitted in favor of grandchildren of the donor or testator, or the children of their brothers and sisters." C. N. 1048 *et seq.*

And the French Code further declares that "He who shall make the dispositions authorized by the preceding articles shall be allowed to nominate in authentic form, *by the same act* or by a later one, *a guardian charged with the execution of such dispositions*," etc. C. N. 1055.

It is apparent that the court correctly stated that the French law was different from ours, and it is likewise apparent why our jurisprudence differs from that of France.

Under the provisions of our Code a testator can not appoint a guardian or administrator, "charged with the execution of dispositions" in favor of minor legatees, because they specifically prohibit *fidei commissa* and trusts; and Mrs. McCan was without power to designate Mr. Hall as an administrator to take the property of her estate into possession and preserve it for the legatees *pendente conditione*.

In the Clague case the court used this pertinent language, viz:

"It is true that this provision of the will"—that relating to the executor's administration of the minors' shares in the property bequeathed—"does not tend to alter the general order of descents, which is believed to be one of the grounds of the prohibition; but is liable to another evil, or inconvenience no less great, which is, that it ties up property for a length of time in the hands of individuals and places it out of the reach of commerce."

That opinion precisely describes the situation of this case.

After having made a most careful and painstaking examination of all adjudicated cases, and read all the briefs with care, I have reached the deliberate conclusion that the decision of the Strauss case in respect to the administration of the property bequeathed was erroneous, and that it is not supported by any decision of this court. The consequence is that the will of Mrs. McCan, can not be sustained, as to the administration of Mr. Hall, predicated as it is, exclusively on that case. To rest a decision of this court on that case is in my opinion to change the current of our jurisprudence, prior thereto and since; and violate the plain provisions of the Code.

For this reason I concur in the opinion of the majority of the court.

McENERY, J., dissents.